**Marc A. NERENSTONE, Plaintiff,**

v.

**William H. BARR, Attorney General of the United States, Defendant.**

**Civ. A. No. 90–2458.**

United States District Court, District of Columbia.

Feb. 19, 1992.

Thomas D. Pearson, Jr., Marc A. Nerenstone, Washington, D.C., for plaintiff.

William Dempster, Asst. U.S. Atty., James Roby, Dept. of Justice, for government.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SPORKIN, District Judge.

This Court has conducted a three day bench trial concerning Plaintiff's allegation that his employer, the Department of Justice ("DOJ"), discriminated against him in violation of the Age Discrimination in Employment Act ("ADEA"). *See* 29 U.S.C. § 621, *et seq.* Specifically, Plaintiff claims that he did not receive a position as an attorney-adviser in Litigation Assistance Support Services ("LASS") because of his age. Because I find that the Plaintiff has failed to prove his case under the ADEA, judgment will be entered in favor of the Defendant.

## FINDINGS OF FACT

Plaintiff in this case is Marc Nerenstone, an employee of the Department of Justice's

Community Relations Service at the GS–14 step–10 level. The Defendant is William Barr, who is being sued in his capacity as the United States Attorney General. This case concerns the events surrounding the DOJ's nonselection of Mr. Nerenstone to either of two openings in its LASS department in July 1985. Those positions were at the GS–11/12 level. Two attorneys younger than 40 years old were hired for the positions. Mr. Nerenstone, who was 56 at the time the positions were filled, claims that his nonselection was caused by discrimination against him on the basis of his age.

Mr. Nerenstone has been a Program Evaluation and Development Officer for the DOJ's Community Relations Service ("CRS") since 1970. In that job his primary tasks are designing computer systems and running statistical analyses to aid in agency planning and budgeting. His performance evaluations show that, in this capacity, Plaintiff has done outstanding work for the Department of Justice and has been a loyal government employee for over 20 years. During his employment at DOJ, Plaintiff also attended George Mason law school at night. He claims he graduated at the top of his class in 1983. After his graduation, Plaintiff wanted to practice law. He made several unsuccessful attempts to get a position as a DOJ attorney.[1] In July, 1985 Plaintiff applied through the experienced attorney program for a position as an attorney/adviser with LASS.

The LASS positions available at that time were at the GS–11 and GS–12 levels and would have involved Plaintiff taking a substantial reduction in pay from his current GS–14 position. The duties of the LASS positions were to design and implement computerized support systems for Department litigation. This involved a substantial amount of time working with DOJ staff

---

**1.** This Court has already dismissed those portions of Plaintiff's original complaint dealing with his unsuccessful application to the Department's Honors Program and to obtain certain other attorney positions. Plaintiff failed to bring a discrimination action in a timely man-

ner or to give sufficient notice within the statutorily mandated time period to bring a claim. The only remaining claim before the Court, then, is Plaintiff's nonselection to the LASS staff.

attorneys who might be unfamiliar with and therefore unreceptive to the idea of working with computers. A key component of the job was the ability to "sell" whatever system was developed to potentially skeptical consumers.

The interpersonal skills of LASS employees were crucial for another reason. LASS was organized to be self supporting. That meant that LASS was to recover its costs from those to whom it provided its litigation support services. The ability to have its services accepted was thus very important to the continued viability of the program.

Plaintiff filled out the standard government employment application, Standard Form 171 and sent it to LASS. The selecting official at LASS was Mark Miller, the Chief of LASS from 1983 until early 1988. Miller, who was 49 at the time of the trial, testified that he received fifty applications for the two jobs in question. Miller stated that when he first saw Plaintiff's application he was interested in him because he had the right kind of technical background. Miller noticed that Nerenstone had attended the same technical high school in New York City as had Miller, and had graduated in an earlier class. Based upon these facts, Miller was ready to look more closely at Nerenstone for the job.

Before he did so, however, Miller consulted Kathleen Smith, one of two attorney/advisers on his staff at the time. Miller went to Smith because he noticed that Nerenstone worked at CRS, and he knew that Smith had also worked there previously. Smith was a valued staff person at LASS and Miller respected her judgment. Smith, who testified at trial, was vehemently opposed to hiring Nerenstone. She told Miller that Nerenstone had been "abrasive" and "obnoxious" while she worked with him at CRS. She stated, in fact, that she would leave the LASS staff before she would work with Nerenstone again. Smith referred Miller to Patricia Maslinoff, the other LASS staff person and Don Hunt a former colleague of Plaintiff, to corroborate her assessment of Mr. Nerenstone.

Miller testified that he was surprised that Smith reacted so strongly against Nerenstone. She had impressed him as a person who was friendly and got along with almost everyone. Miller decided, therefore, to speak with Maslinoff and Hunt regarding Mr. Nerenstone. Both Maslinoff and Hunt confirmed Smith's view that Nerenstone was abrasive.

Maslinoff, a graduate of the University of Chicago law school, told Miller that on the one occasion she had met Nerenstone, he had been "rude" to her. Maslinoff testified that on that occasion she was working when Smith introduced her to Nerenstone. Nerenstone had been passing near the LASS offices when he came across his former colleague Smith, who offered to show him around her office. In so doing, they bumped into Maslinoff who explained briefly how she was using the computer in the performance of her job. Within minutes of meeting her, Nerenstone began criticizing what Maslinoff was doing. He said she was using the wrong software and hardware and suggested a system which she could use to better do her job. Maslinoff was totally flustered by Nerenstone's actions and attitude. She simply did not want to work with someone who was so abrupt and offensive. When she discussed Nerenstone with her supervisor, Miller, she told him that based upon this encounter, she did not believe that Nerenstone had the requisite interpersonal skills for the LASS jobs. Miller then approached Don Hunt, who dealt with Nerenstone when Hunt was on the Litigation and Information Systems Staff ("LISS"). Hunt confirmed that Nerenstone was "abrasive" and a difficult person to work with.

Based on the information Miller obtained from Smith, Maslinoff and Hunt he decided that Plaintiff was not the right person for the vacant LASS positions. When Plaintiff telephoned Miller to inquire into the status of his application, Miller told him that he would not be interviewed for a position. Plaintiff asked for the reason he had been rejected, and Miller told him that he "was too senior" because LASS was "looking for entry level people." At that time Nerenstone was not told of the other reason he

had been rejected, namely that he was difficult to work with and that two highly valued employees on the LASS staff did not want to work with him.

In telling Nerenstone he was too senior for the job, Miller said he was referring to the fact that Plaintiff's current job was at the GS–14 step 10 level and the available LASS positions were at the GS–11/12 levels. In his conversations with Nerenstone, Miller did not want to reveal to him the adverse comments about his abrasive personality which Miller had received from Smith, Maslinoff and Hunt. This was because Miller wanted both to protect his sources and to spare Nerenstone from being told of these negative comments. Upon being turned down for the position, Plaintiff brought this suit.

## DISCUSSION

### A. The Legal Standard:

In *Miller v. Lyng*, 660 F.Supp. 1375, 1376 (D.D.C.1987), this Court articulated the appropriate legal standard to be applied in a case brought under the ADEA:

> The District of Columbia Circuit has explained that in an action under the ADEA:
>
> 'the plaintiff's ultimate burden is to prove that age was 'a determining factor' in the challenged employment decision ... The Plaintiff must prove that 'age made a difference in the employer's decision' ... in the sense that, 'but for' the discriminatory motive, the employee would have been hired, promoted, or retained.'
>
> *Krodel v. Young*, 748 F.2d 701, 706 (D.C.Cir.1984), *cert. denied* [474 U.S. 817] 106 S.Ct. 62 (1985), 88 L.Ed.2d 51 (1985) (citations omitted). To determine whether the plaintiff has met this ultimate burden, the D.C. Circuit has adopted the tripartite evidentiary scheme of Title VII cases articulated by the Supreme Court in *McDonnell–Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Krodel*, 748 F.2d at 705, *Coburn v. Pan American World Airways, Inc.*, 711 F.2d 339, 342–43 (D.C.Cir.1983), *cert. denied*, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683, *Cud-*

*dy v. Carmen*, 694 F.2d 853, 856–57 (D.C.Cir.1982).

> The plaintiff must first establish a prima facie case of discrimination through proof of 'sufficient facts to create a reasonable inference that ... age was a factor in the employment decision at issue.' *Krodel*, 748 F.2d at 705. Once the prima facie case has been made, the employer bears a 'minimal burden' of putting forward a legitimate, non-discriminatory basis for its decision. Should the employer meet this burden, the plaintiff may then attempt to show that the employer's rationale is merely pretextual, which he can do 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

■ Plaintiff can establish his prima facie case by proving that he (1) belongs to the statutorily protected age group, (2) was qualified for the position, (3) was not given the position despite being qualified, and (4) a younger person was selected for the position. *See, Miller v. Lyng*, 660 F.Supp. at 1377. Defendant must then articulate a non-discriminatory reason for its decision, and Plaintiff then has the burden of proving that reason to be pretextual. After hearing all the Plaintiff's evidence, I find that Plaintiff has not established that any discriminatory motive existed or that age had any role in his nonselection to the LASS position.

### B. Analysis:

■ Defendant has conceded that Plaintiff has made out his prima facie case. Plaintiff is a member of a protected class because at the time of the hiring decision at issue Mr. Nerenstone was 56 years old. He was qualified for a position on the LASS staff. Plaintiff was licensed to practice law, and at the time of his nonselection Plaintiff held a job with a higher grade than the grade that accompanied the LASS

job. It is conceded that both persons selected for the vacancies at LASS were under 40. Thus, Plaintiff has established all the elements of a prima facie case under the ADEA.

Defendant, however, has articulated a legitimate, nondiscriminatory reason for Plaintiff's nonselection. "[A] decision ... not to hire a person because of his or her disruptive or uncooperative behavior is proper ... because it relies on a legitimate, nondiscriminatory reason." *Chalk v. Secretary of Labor,* 565 F.2d 764, 768 (D.C.Cir.1977) (citations omitted). Plaintiff was not hired because the selecting official believed that he did not have the proper temperament for the LASS job. In *Chalk* the court found the plaintiff's "abusive manner" to be a legitimate reason for not hiring him as a writer/editor position at the Department of Labor. *Id.* In this case it was Plaintiff's abrasive personality which caused Miller not to hire him.

Indeed, Plaintiff's abrasive personality presents an even stronger case for nonselection than it did in *Chalk.* Good interpersonal skills were an integral component of the job to which Plaintiff applied. Plaintiff was not applying to be a writer/editor, or even a computer programmer. Plaintiff was applying for a job which entailed convincing litigating attorneys to use LASS's computer support services. The ability to serve potential "customers" was crucial to the office's success and indeed its survival. Miller concluded that Plaintiff simply did not possess the requisite interpersonal skills for the vacant positions. Unlike *Chalk,* Miller did not base his opinion of Plaintiff on a single outburst. Rather, he first sought the opinion of Ms. Smith, who had worked closely with Plaintiff over a long period of time. Even after he received her opinion, he consulted Maslinoff and Hunt, both of whom corroborated the opinion that Nerenstone was difficult to work with and abrasive.

Plaintiff has not presented evidence that proves Defendant's reasons for not hiring Plaintiff were pretextual. The Court credits Mr. Miller's testimony that his statement that Plaintiff was "too senior" had nothing to do with Plaintiff's age. Miller was referring to Plaintiff's GS–14 grade and his doubt as to whether Plaintiff would be willing to accept the pay cut which taking the GS–11/12 LASS position would entail. This coupled with the poor reviews Nerenstone had received from Smith, Maslinoff and Hunt makes it clear that Plaintiff's not being hired had nothing to do with his age. It was his negative personality which deprived him of the opportunity to be hired.

This Court's own observation of Mr. Nerenstone's demeanor at trial and at pretrial hearings further showed Defendant's reasons not to be pretextual. Plaintiff appeared to be an intelligent person. However, he was overly aggressive and abrasive. At times he would interrupt his counsel's presentation in a rude manner. At other times he would abruptly leave and return to the courtroom without any explanation.

Mr. Nerenstone's response to the allegations concerning his encounter with Maslinoff are also illustrative of this point. Nerenstone insisted that his comments about Maslinoff using the wrong hardware and software were correct. That response missed the point. Even if Maslinoff was using the incorrect system, it really was not Plaintiff's place to tell her so, especially in the rude way he did. He was a guest in her office. He had only known her for a few minutes when he began to tell her that she was not doing her job correctly.

Nerenstone does not dispute Maslinoff's testimony. Rather than admitting he had acted improperly, he tried to justify his actions by proving that his criticism was well founded. He clearly needs to take a Dale Carnegie course in how to get along with others. It is clear that Plaintiff's attitude, if displayed towards an attorney about a pending litigation, might well cause the attorney not to employ LASS's computer services. Against this background, it was legitimate and nonpretextual for Defendant not to hire Plaintiff based on his negative personality.

Even though Plaintiff's legal claim lacks merit the Court does not understand why the DOJ cannot find some legal position for Plaintiff, who has been a twenty year DOJ employee at the very senior GS–14 level. His work performance has been more than satisfactory, and he has been a hardworking and loyal employee. While at the DOJ, Nerenstone attended law school at night and did well. Based upon his interest in practicing law, Plaintiff claims he is willing to take a substantial reduction in pay in order to obtain a legal position. It would seem that an organization as large as the DOJ could find some legal position for such a longtime employee who had taken the commendable step of attending law school at night. Not all legal jobs require a pleasant personality. Some lawyers have proven to be quite successful despite their abrasiveness and rudeness—or perhaps because of such traits. A visit to this Judge's courtroom on any given day would confirm this observation. Indeed, the way a good number of trial attorneys cross examine witnesses would make one think that how to be rude and disrespectful were core elements of every trial advocacy course.

The worst result that could befall the DOJ would be a savings of thousands of dollars a year by the DOJ as a result of the pay reduction Plaintiff would probably have to take to obtain an entry level legal position. With thousands of legal jobs at the DOJ there must be one "pit bull" legal position which this Plaintiff could occupy. While such a course makes sense to the Court, it is not mandated by the ADEA.

Judgment will be entered for the Defendant.